SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Christine A. Okike
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel for Patriarch Partners XV, LLC*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **ZOHAR CDO 2003-1, LIMITED <u>et al.</u>,** | : | **Case No. 15-23680 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Involuntary Petitions Pending)** |
| | : | |
| | : | |

## NOTICE OF MOTION OF PETITIONING CREDITOR, PATRIARCH PARTNERS XV, LLC TO TERMINATE THE DEBTORS' PLAN EXCLUSIVITY PERIODS

**PLEASE TAKE NOTICE** that Patriarch Partners XV, LLC (the "Petitioning

Creditor"), by and through its undersigned counsel, hereby files the *Motion of Petitioning*

*Creditor, Patriarch Partners XV, LLC to Terminate the Debtors' Plan Exclusivity Periods* (the

"Motion"), attached hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion may be

scheduled before the Honorable Robert D. Drain, United States Bankruptcy Judge for the

---

[1]    The Debtors and, where applicable, the last four digits of their taxpayer identification numbers are as follows: Zohar CDO 2003-1, Limited (5119), Zohar CDO 2003-1, Corp., and Zohar CDO 2003-1, LLC. The address for Zohar CDO 2003-1, Limited is c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands and the address for all other Debtors is c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711.

Southern District of New York, in the United States Bankruptcy Court for the Southern District

of New York (the "Bankruptcy Court"), 300 Quarropas Street, Room 118, White Plains, NY

10601. In the event that a hearing on the Motion is scheduled, a supplementary notice setting

forth the date, time, and objection deadline for such hearing will be filed with the Bankruptcy

Court on the dockets of Case No. 15-23680, Case No. 15-23681, and Case No. 15-23682 (the

"Exclusivity Hearing Notice") .

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the

Motion must be made in writing and (a) filed with the Bankruptcy Court no later than the

objection deadline provided in the Exclusivity Hearing Notice  (the "Objection Deadline") and

(b) served so as to be actually received by the following parties by the Objection Deadline:

(i) the Petitioning Creditor; (ii) the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York; (iv) counsel to MBIA Inc. and MBIA Insurance Corporation;

(v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; and (vii) any

such other party entitled to notice pursuant to Local Bankruptcy Rule for the Southern District of

New York 9013-1(b).

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated:   New York, New York
         November 22, 2015

SKADDEN, ARPS, SLATE, MEAGHER  & FLOM LLP

By:    */s/ Jay M. Goffman*          
       Jay M. Goffman
       Mark A. McDermott
       Shana A. Elberg
       Christine A. Okike
       Four Times Square
       New York, New York 10036
       (212) 735-3000

*Counsel for Patriarch Partners XV, LLC*

**Exhibit A**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Christine A. Okike
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditor, Patriarch Partners XV, LLC*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **ZOHAR CDO 2003-1, LIMITED, et al.,** | : | **Case No. 15-23680 (RDD)** |
| | : | |
| Debtors.[1] | : | **Involuntary Petitions Pending** |
| | : | |
| | : | |

## MOTION OF PETITIONING CREDITOR, PATRIARCH PARTNERS XV, LLC
## TO TERMINATE THE DEBTORS' PLAN EXCLUSIVITY PERIODS

Patriarch Partners XV, LLC ("Patriarch XV"), the largest creditor of Zohar CDO

2003-1, Limited ("Zohar-I"), by and through its undersigned counsel, respectfully submits this

motion (the "Motion") for entry of an order, pursuant to section 1121(d) of title 11 of the United

States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), terminating the exclusive plan

filing and solicitation periods (the "Exclusive Periods") of Zohar-I, Zohar CDO 2003-1, Corp.,

and Zohar CDO 2003-1, LLC (collectively, the "Debtors"). In support of this Motion, Patriarch

XV respectfully states as follows:

---

[1] The Debtors and, where applicable, the last four digits of their taxpayer identification numbers are as follows: Zohar CDO 2003-1, Limited (5119), Zohar CDO 2003-1, Corp., and Zohar CDO 2003-1, LLC. The address for Zohar CDO 2003-1, Limited is c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands and the address for all other Debtors is c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711.

<u>**PRELIMINARY STATEMENT**</u>

1.      Patriarch XV, the holder of approximately $286.5 million in debt issued by Zohar-I, has filed this involuntary petition in order to protect itself and Zohar-I from the fraudulent efforts of a more senior creditor, MBIA, Inc. and MBIA Insurance Corporation (collectively, "<u>MBIA</u>"), to arrogate the value of Zohar-I's assets for itself, and to the substantial prejudice of Patriarch XV.  Patriarch XV has been forced to pursue this route because of MBIA's fraudulent scheme to induce Patriarch XV to spend over $103 million to buy out a third-party noteholder in Zohar-I to facilitate a restructuring of Zohar-I.

2.      As described further below, after Patriarch bought the debt, MBIA reneged on its agreement to extend the maturity of Zohar-I.  It did so in order to foreclose on the assets of Zohar-I.  Those assets are comprised of debt obligations owed to Zohar-I by borrowers, comprised of manufacturing companies in various stages of distress or restructuring.  These debt obligations were acquired by Zohar-I beginning in 2003.  The companies have been managed by an affiliate of Patriarch XV that is owned and controlled by Ms. Lynn Tilton, one of the most active and successful distressed investors and turnaround managers in the country.

3.      As further explained below, MBIA also has designs on another fund managed by Ms. Tilton, referred to as Zohar-II below.  MBIA has over five times the exposure -- $808 million – to Zohar-II than it does to Zohar-I.  Zohar-I and Zohar-II hold debt obligations of certain of the same companies.  If MBIA obtains the debt positions owned by Zohar-I at fire sale prices, to the detriment of the junior debt that Patriarch XV was fraudulently induced to purchase, MBIA will use those positions against the operating companies to enhance its recoveries on its much larger exposure to Zohar-II to the detriment of the companies and Zohar-II.  Indeed, that is MBIA's publicly-stated plan.  Further, many of these companies are also

2

obligors of Zohar-III, a collateralized loan obligation where MBIA has no interests.  MBIA's scheme will certainly cause untold damage to that collateralized loan obligation, whose stated maturity is not until April, 2019 and whose value is anticipated today to fully repay the noteholders with upside to the equity.

4.      As explained below, Patriarch XV has developed a restructuring plan for Zohar-I that will pay MBIA's more senior notes in full while maximizing value for Patriarch XV as well, while also protecting the value of the underlying operating companies and the noteholders of Zohar-II and Zohar-III, which too, could also be adversely affected by MBIA's scheme. Patriarch XV should be allowed to propose that plan now to bring to an end over three years of deceitful negotiations by MBIA.  Zohar-I itself has no meaningful interest in proposing a plan itself.  Indeed, under the relevant documents, MBIA is the "Controlling Party" of Zohar-I.  Only MBIA, and not Zohar-I or Patriarch XV, has the exclusive authority to control the disposition of Zohar-I's assets.

5.      Accordingly, there is no prejudice to Zohar-I in terminating exclusivity.  To the contrary, termination of exclusivity will allow Patriarch XV to materially advance Zohar-I's restructuring, a restructuring that MBIA, as the "Controlling Person," has surreptitiously frustrated and foiled during three years of fraudulent conduct.  It is time for MBIA's conduct to be checked by a court of equity; for this Court to allow Patriarch XV to utilize the tools afforded by the Bankruptcy Code to protect value for itself, while simultaneously paying MBIA off in full.  Exclusivity, therefore, should be terminated.

## **JURISDICTION**

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Code section 1121(d).

## **BACKGROUND**

### A.   **Overview of Zohar-1**

7.      Zohar-I is a collateralized loan obligation ("CLO").  A CLO is a special purpose vehicle that issues notes to investors in exchange for cash.  The CLO uses the cash to invest in loans or other assets that, in turn, generate cash to pay back the CLO's investors over time with interest.  Zohar-I was created in 2003 by Ms. Tilton.  Zohar-I is managed by Patriarch Partners VIII, LLC ("Patriarch VIII"), an entity that is affiliated with petitioning creditor Patriarch XV. Ms. Tilton owns and controls both Patriarch VIII, founded by her in 2003, and Patriarch XV, founded by her in 2005.  She also serves as the manager of the Patriarch entities.

8.      Ms. Tilton and the Patriarch entities focus on the acquisition and invigoration of undervalued, iconic American brands where time, capital and sound strategy can rescue a business and restore value.   They are primarily domestic manufacturing companies that produce goods "made in the U.S.A.," including a defense contractor that supplies major military hardware (e.g., helicopters) to U.S. and foreign militaries.  Together with several other Patriarch entities, Ms. Tilton actively manages approximately 74 of these companies.  Since 2000, Patriarch entities and their investment funds have had ownership in and restructured more than 240 companies with combined revenues of over $100 billion, representing more than 674,000 jobs. Ms. Tilton's platform is one of the largest woman-owned businesses in the United States.

9.      Zohar-I owns the debt of borrowers in the aggregate face amount of approximately $393,367,660. Ms. Tilton owns significant equity interests in the companies and, as noted above, is actively involved in their management.   In addition, Ms. Tilton has invested

in certain of the Zohar-I portfolio companies side by side with Zohar-I in the aggregate amount of $218,632,598.99. Zohar-I is obligated on approximately $149.0 million outstanding principal amount of class A-1 and A-2 floating rate notes (the "A-1 and A-2 Notes") that are controlled by MBIA. Zohar-I is also obligated on approximately $286.5 million outstanding principal amount of class A-3 floating rate notes (the "A-3 Notes") that are owned by petitioning creditor Patriarch XV. Another entity controlled by Ms. Tilton, Octaluna LLC ("Octaluna"), owns certain class B notes (the "B Notes") and preference shares of Zohar-I.

10.     Zohar-I is a company limited by shares, organized under the laws of the Cayman Islands. But, its common shares do not entitle their holder to any meaningful economic value. Zohar-I has two directors, both of whom reside in the Cayman Islands. It has no employees. The notes and other documentation evidencing the debt obligations and cash owned by Zohar-I are held in New York City by the indenture trustee, U.S. Bank National Association. Patriarch VIII manages Zohar-I from its office in New York City. *See In re Zais Investment Grade Limited VII*, 455 B.R. 839 (Bankr. D. N.J. 2011) (Cayman Islands CLO was an eligible debtor under 11 U.S.C. § 109(a) where its assets were held in New York).

11.     As noted above, MBIA controls the A-1 and A-2 Notes. MBIA, which has its executive offices in Westchester County, New York, is the world's largest "monoline" insurer, having written financial guaranty policies covering a variety of structured finance securities, including notes issued by CLOs. Under a CLO insurance policy, MBIA guaranteed the scheduled payments of interest and principal to noteholders in the event of a payment default by the CLO issuer. In other words, if the issuer could not pay back noteholders, MBIA would.

12.     Upon a default by Zohar-I, MBIA has first claim on the assets of Zohar-I with respect to the A-1 and A-2 Notes. Moreover, MBIA is the "Controlling Party" of Zohar-I, a term

5

defined in the indenture governing the A-1 and A-2 Notes, the A-3 Notes and the B Notes (collectively, the "Notes").  As the Controlling Party, MBIA has the exclusive right to control disposition of the assets of Zohar-I.  None of Zohar-I's Cayman Islands directors, Ms. Tilton, the Patriarch entities, Octaluna, or any other entity has any right to do so.  Under the indenture, upon an event of default in payment of the A-1 and A-2 Notes, which occurred when they matured on November 20, 2015, the role of Zohar-I's manager, Patriarch VIII, has been substantially eliminated.

13.     As noted above, other Patriarch entities manage separate funds created by Ms. Tilton, including Zohar-II 2005-1, Limited ("Zohar-II") and Zohar-III, Limited ("Zohar-III"). Zohar-II and Zohar-III are CLOs that also invest in many of the same companies in which Zohar-I has invested.  In particular, certain of such companies have issued debt that is held by one or more of Zohar-I, Zohar-II and Zohar-III (collectively, the "Zohar Funds").  The Zohar Funds collectively have invested more than $2.5 billion raised from Zohar Fund noteholders.  MBIA has insured approximately $808 million in notes issued by Zohar-II.  MBIA has not insured any of the notes issued by Zohar-III.

**B.     MBIA's Early Relationship with the Zohar Funds**

     **(i)     MBIA Enlists Patriarch's Help**

14.     Between 1996 and 2002, MBIA and/or its affiliates issued insurance policies and/or surety bonds with respect to certain senior notes issued by seven collateralized debt obligation ("CDO") issuers (the "MBIA Funds").  In 2002, MBIA faced an enormous insurance exposure and expected financial shortfall of between $91 million and $297 million with respect to financial guaranty insurance policies it held covering the senior notes issued by the MBIA

Funds.   By April 2003, MBIA had determined that its loss reserves could only cover approximately $10 million of the expected shortfalls of the underperforming MBIA Funds.

15.     To remediate the troubled MBIA Funds that threatened to cause severe financial distress to MBIA, MBIA turned to Ms. Tilton and Patriarch, neither of whom had any prior involvement with the MBIA Funds.   In April 2003, Patriarch and certain affiliates agreed to assume the role of manager of the MBIA Funds in order to effect a turnaround of the otherwise failing CDOs and to mitigate any potential losses to MBIA.   In return, MBIA was to provide financial guaranty insurance on the A-1 and A-2 Notes issued by Zohar-I, which was then a newly-created fund.

16.     In 2004, Ms. Tilton and Patriarch began work on a new CLO, Zohar-II, that could invest alongside Zohar-I.   In January 2005, Zohar-II issued $1 billion in funded, senior notes— almost twice as much as Zohar-I had issued.   MBIA insured $1 billion of the Zohar-II class A notes, in addition to the $180 million in insured Zohar-I class A-1 and A-2 Notes.   In April 2007, Ms. Tilton and Patriarch created another CLO fund, Zohar-III, containing collateral overlapping with Zohar-I and Zohar-II.   As noted above, MBIA did not insure Zohar-III.

**(ii)     MBIA Becomes Distressed**

17.     In 2007, there were growing concerns about the health of the real estate markets, the risks of certain financial products (including those linked to real estate) and MBIA's potential liabilities to its structured-finance policy holders.   In the summer of 2007, the housing bubble burst and caused capital markets, including the market for structured products, to freeze.   The financial markets continued to deteriorate during 2008, at least, in part, because of concerns about financial institutions' and insurers' exposure to structured-finance obligations.

18.     Moody's and S&P downgraded MBIA Insurance's credit rating in a series of reports, noting their opinions that MBIA Insurance would "face diminished public finance and structured finance new business flow and declining financial flexibility," that continuing deterioration in the structured-finance markets would place pressure on MBIA Insurance's capital adequacy, and that there was an "expectation of greater losses on [MBIA Insurance's] mortgage related exposure."  The market for CDOs shut down and MBIA stopped issuing insurance on structured products altogether.

**(iii)     MBIA's Sues Patriarch – And Loses**

19.     In April 2009, MBIA filed suit against two Patriarch affiliates in the United States District Court for the Southern District of New York, captioned *MBIA Insurance Corporation v. Patriarch, et al.*, 09 Civ. 3255 (RWS), alleging that they had breached agreements entered into among MBIA and the Patriarch affiliates regarding Zohar-I and the MBIA Funds' remediation plan.  MBIA alleged that under the agreements, Patriarch VIII was obligated to seek a rating for the Zohar-I B Notes and to subsequently contribute the notes to the MBIA Funds.

20.     In desperate need of capital, MBIA sought to obtain $180 million in cash, the value they placed on the B Notes, an upside hope note for which they paid no money.  The B Notes, which were subordinate to the senior notes MBIA insured, were designed, if upside value could be created from the underlying loans, to help rescue MBIA from its impending financial losses stemming from MBIA Funds.  In response to the suit, the two Patriarch affiliates argued that the Zohar-I Class B notes were never able to be rated such that they were required to be contributed.  On June 10, 2013, following a fourteen-day bench trial, the Honorable Robert W. Sweet rejected MBIA's claims and ruled in favor of the Patriarch affiliates.  *See MBIA Insurance Corporation v. Patriarch*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013).

C.        **Patriarch's Efforts To Restructure Zohar-I**

21.        The financial crisis hit the Zohar Funds' portfolio companies, small and mid-sized

companies already in distress, hard.  Some of the portfolio companies could not pay full interest

on the loans they took from the Zohar Funds and turnarounds became difficult to achieve.  Bank

lending for small- and mid-sized companies could not be accessed, making refinancing unlikely.

Moreover, many banks were enforcing any rights they had to call loans that were out of

compliance with loan covenants.  The merger and acquisition market all but dried up, making

exit sales at appropriate prices impossible to achieve.  As a result, amortization on the Notes has

been slow and Zohar-I's ability to repay the Notes upon maturity has been jeopardized.

22.        The Zohar-I transaction documents provide that the Zohar-I notes were scheduled

to mature on November 20, 2015.  On that date, noteholders were due all principal and interest

owed by Zohar-I.  MBIA therefore is obligated to pay the outstanding principal and interest to

the insured noteholders to the extent that Zohar-I did not do so on the maturity date.  Over three

years ago, in anticipation of the maturity on November 20, 2015, Patriarch called a meeting with

the Zohar-I noteholders, including MBIA and the holder of the A-3 Notes, which at that time was

not the petitioning creditor, but an unaffiliated third-party (the "A-3 Noteholder").

23.        At the meeting, Patriarch explained that amortization would be slow and value

would take time to rebuild.  Patriarch proposed extending the maturity date of the Zohar-I Notes.

For an extension, all noteholders would have to consent.  In response to the proposal, Anthony

McKiernan, an executive of both MBIA Inc. and MBIA Insurance, expressed MBIA's significant

interest in extending the maturity of Zohar-I to January 2017, to match the maturity date of

Zohar-II.

24.     On March 8, 2013, MBIA and Patriarch arranged a conference call to discuss the possible terms of an extension.  McKiernan provided to Patriarch the terms under which MBIA would consent to an extension of the Zohar-I maturity.  Patriarch was to draft a term sheet based on MBIA's terms to present to the Zohar-I noteholders, including the A-3 Noteholder.  During this conversation, McKiernan told Patriarch that MBIA viewed the A-3 Noteholder as an "impediment" to getting the extension done because the A-3 Noteholder had not invested in Zohar-II or Zohar-III and thus had a different time horizon and different interests.

25.     MBIA, on the other hand, had over $800 million in exposure to Zohar-II (*i.e.*, more than five times its exposure to Zohar-I), and therefore wanted an extension.  MBIA made clear to Patriarch that it would consent to an extension of Zohar-I if Patriarch was somehow able to remove what MBIA viewed as the "impediment" that the A-3 Noteholder presented.  If the A-3 Noteholder "impediment" were removed, MBIA had the ability to obtain all necessary consents to an extension and a restructuring.

26.     On or about March 15, 2013, Patriarch presented to MBIA and the A-3 Noteholder a term sheet proposing the terms for an extension of Zohar-I's maturity from November 2015 to January 2017.  This proposal was the result of the negotiations between Patriarch and many of the terms on the term sheet were included at MBIA's insistence.  MBIA ceased responding to Patriarch's repeated attempts to move the Zohar-I extension discussions forward.

27.     In August 2013, MBIA told Patriarch that it was going to meet with the A-3 Noteholder directly about an extension, but no agreement from the A-3 Noteholder was obtained.  Between March 2013 and October 2013, MBIA repeatedly stated to Patriarch that it was the A-3

Noteholder that was the impediment to an extension of the Zohar-I maturity and that if that impediment were removed, MBIA would consent to an extension.

28.     In October 2013, Patriarch retained Moelis & Company LLC ("Moelis") to assist with a possible restructuring of all three Zohar Funds in order to increase the value and performance of the funds.   Patriarch and MBIA recognized that a Zohar-I maturity extension could both provide additional time for Zohar-I to avoid a default and simultaneously facilitate a future restructuring of the Zohar Funds.   The first step for MBIA, as stated, was to extend Zohar-I so as to make the Zohar-I and II maturities coterminous.   Through the end of 2013 and into 2015, Patriarch, MBIA and Moelis continued to discuss an overall restructuring of the Zohar Funds and engaged in unsuccessful efforts to win the support of the A-3 Noteholder with respect to a Zohar-I maturity extension.   Over this period, MBIA repeatedly asserted that the A-3 Noteholder was the "impediment" to an extension.

29.     During this period, McKiernan also met regularly and had numerous telephone calls with Ms. Tilton, during which they discussed in detail potential plans for extending Zohar-I and restructuring the Zohar Funds.   McKiernan consistently expressed that MBIA's interests were aligned with Patriarch's and that it shared a common goal of achieving a global restructuring.

30.     Patriarch also expended substantial time and extensive resources attempting to satisfy requests from MBIA and its advisors for information MBIA claimed it needed to evaluate a global restructuring.   This included setting up a data room for MBIA's advisors and responding as best Patriarch could, consistent with its obligations, to countless information requests from MBIA.

31.     As described further below, however, it is now apparent that the foregoing was part of McKiernan's strategy to gain Ms. Tilton's trust and to convince her that MBIA had put the prior litigation behind it and that it was committed to achieving shared goals.  Indeed, during this time, McKiernan repeatedly urged Ms. Tilton to communicate with him in person or by telephone, rather than through email, whenever possible.  Petitioning creditor now believes this request was made not out of some concern for confidentiality, but rather to avoid leaving a paper trail of McKiernan's misrepresentations.

32.     In August 2014, Patriarch received a proposal from an outside lender to finance the restructuring of the Zohar Funds.  Patriarch had been in constant and continued discussions with MBIA through this period to discuss the Zohar Funds' restructuring.  Patriarch presented the term sheet for this proposal to MBIA for its consideration.  By September 8, 2014, Moelis had engaged with MBIA directly in order to negotiate the terms of the overall restructuring, in addition to the Zohar-I extension.  Among other things, during this period, the parties discussed the need for MBIA to contribute, along with Patriarch, to any repurchase of the Zohar-I and Zohar-II notes that might be necessary as part of a restructuring, as the A-3 Noteholder impediment still existed.

33.     Earlier this year, on or about February 11, 2015, Patriarch and its advisors, and MBIA and its advisors, scheduled another meeting to discuss the upcoming maturity date of Zohar-I and the then-current state of negotiations, including both an extension of the Zohar-I maturity date and a restructuring of the Zohar Funds.  Despite Patriarch's efforts, no real progress had been made towards MBIA's financial participation in the repurchase of the Zohar-I notes or a Zohar-I extension and there was an impending maturity date with no agreement to extend.

34.     In email correspondence between Ms. Tilton and McKiernan on February 11, 2015, Ms. Tilton stressed the significance of the upcoming meeting, noting that "[n]othing is more important to me than to move forward on what is best for the funds."   On February 17, 2015, a meeting was held at Patriarch's offices in lower Manhattan.   Among others, Ms. Tilton from Patriarch and McKiernan from MBIA participated.   McKiernan reiterated that a Zohar-I extension would avoid a default and be the first step in a full restructuring of Zohar-I and II, because the extension would align the maturity dates of Zohar-I and II and hence, allow for more time for the parties to work out complex details to avoid a situation where the portfolio companies were faced with disparate treatment between Zohar-I and Zohar-II.

35.     On March 3, 2015, the pressure on MBIA to reach a global restructuring of the Zohar Funds intensified when Moody's announced that it had put MBIA's insurance financial strength rating on "negative" outlook.   Moody's stated that its actions "reflect the heightened risk in the Zohar I and II CLO notes that MBIA Corp. insures" and that "absent a successful remediation, these exposures could result in meaningful strain on [MBIA's] capital and liquidity profiles."

36.     Moody's further commented that "MBIA [Insurance's] exposure to the first Zohar CLO, maturing in November 2015, is manageable, however failure to reach a global settlement on all Zohar deals would expose MBIA Corp to meaningful claim payments and losses on the much larger Zohar II CLO, that matures in 2017."   Significantly, Moody's urged MBIA to resolve the situation *before* Zohar-I matured in November 2015.   Specifically, Moody's warned of the "[i]ncreased potential for significant liquidity and capital strain in the event of a failure to restructure the Zohar CLOs on terms that significantly reduce MBIA [Insurance's] potential for loss, ahead of the November 2015 maturity of the Zohar I CLO."

**D.**     **Events Leading to the Chapter 11 Petition**

    **(i)**     **The A-3 Notes Purchase**

37.     On March 19, 2015, Patriarch learned that the A-3 Noteholder intended to sell all of its Zohar-I notes in an auction the following week.  By buying the notes at auction, Patriarch could remove what MBIA had long identified as the impediment to a Zohar-I extension.  On March 21, 2015, Ms. Tilton emailed McKiernan notifying him that A-3 Noteholder was going to sell at auction and that Patriarch was "considering a bid."

38.     On March 23, 2015, Ms. Tilton again emailed McKiernan, this time to follow-up on the extension and restructuring initiatives discussed at the February 17 meeting.  McKiernan responded by email on March 25, 2015, that "MBIA remains intent on continuing the process established on February 17 working with our respective advisors to resolve the Zohar issues." That process necessarily included MBIA's commitment to an extension of the maturity date of Zohar-I if the "impediment" was removed.

39.     On March 26, 2015, in reliance on McKiernan's and MBIA's prior representations, Ms. Tilton, through petitioning creditor, Patriarch XV, submitted a bid to purchase the A-3 Notes for $103,919,863.34, a bid that the A-3 Noteholder accepted.  Ms. Tilton, through Patriarch XV, bought the notes for that amount taking into account their value with an extension and the increase to the value of Zohar-II and Zohar-III that the extension would represent.  There is no dispute, however, that the current value of Zohar-I is significantly less than the face amount of the Notes, but that the A-1 and A-2 Notes are oversecured.

    **(ii)**     **MBIA Reneges on Its Agreement**

40.     Within days, MBIA reneged.  As it turns out, MBIA's representations regarding the A-3 Noteholder were false.  MBIA never genuinely intended to consent to an extension of

the Zohar-I maturity unless it could extract onerous and substantial concessions in an overall restructuring of the Zohar Funds.  MBIA tricked Patriarch into purchasing the A-3 Notes by fraudulently representing that MBIA would consent to an extension if the impediment presented by the A-3 Noteholder was removed.

41.     Following a conversation on April 13, 2015, Patriarch sent a letter to MBIA's counsel expressing Patriarch's "surprise to learn . . . that MBIA is not interested in extending Zohar I without a concurrent restructure of Zohar II" given that "McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I."  By letter dated April 19, 2015, Ms. Tilton again reminded MBIA of its commitment, stating that "Anthony McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I."

42.     In a letter later that same day, McKiernan re-confirmed that MBIA had reneged on the commitment it had made at the February 17 meeting.  McKiernan wrote to Ms. Tilton that, "[r]egarding Zohar I, we have no basis to determine whether an extension is in MBIA's best interest.  To make that assessment, we need, among other things, full and unfettered access to information regarding the collateral and the borrowers."

43.     This information demand was a pretext.  Providing such information had never before been a pre-condition for MBIA's consent to a Zohar-I extension, and, in any event, substantial information had previously been provided on multiple occasions over many years. Most incredibly, MBIA not only rejected its agreement to consent and take necessary steps to extend Zohar-I upon the purchase of the A-3 Notes by Patriarch XV, but also has since denied that MBIA had ever received any restructuring proposals regarding the Zohar Funds.  On August 5, 2015, C. Edward Chaplin, CAO and CFO of MBIA Inc., stated on an earnings call that, "while

we believe that a global negotiated solution that would refinance or restructure the Zohar's CDO

is in the best interest of all parties, *a proposal to that end has not materialized at this point* . . . ."

44.     This statement is directly contradicted by the extension and restructuring

proposals presented to MBIA by Patriarch throughout 2013 and 2014, as described above.

Indeed, MBIA has apparently confirmed its true strategy with Moody's.  On October 9, 2015,

Moody's issued a report on MBIA, which continued to express concern that there was a risk to

MBIA that Zohar-II would default if an overall restructuring could not be reached before the

Zohar-I maturity.  Moody's report reveals, however, that MBIA was seeking to convince the

rating agency that a Zohar-I maturity would actually be a *positive* development for MBIA:

> If the Zohar I CLO notes are not restructured ahead of their November 20, 2015
> maturity, it is likely that they will default, and MBIA Corp. will make a claim
> payment of all or part of the $151 million in principle due at maturity. A default
> would trigger MBIA's gaining certain rights and authority over the notes, which
> would see them in a better position to take steps to mitigate their losses on a
> potential default of both the Zohar I and II CLOs ($151 million and $808 million
> in principal at June 30, 2015, respectively). However, we believe that the inability
> to reach agreement on a favorable restructuring ahead of the Zohar I CLO
> maturity increases the risk of a default on the Zohar II CLO notes in 2017.

45.     Despite MBIA's failure to adhere to its commitment at the February 17 meeting,

Patriarch continued its extensive—and, to date, fruitless—effort to effect an extension of Zohar-I

and a global restructuring.  MBIA, by contrast, has refused to agree to reasonable terms to a

global restructuring despite numerous proposals presented by Patriarch.

46.     Accordingly, on November 2, 2015, Ms. Tilton and Patriarch XV filed suit

against MBIA in the Supreme Court of the State of New York, County of Westchester, the

location of MBIA's executive offices.  In that action, Ms. Tilton and Patriarch XV are suing

MBIA for fraudulent inducement, promissory fraud, breach of contract and promissory estoppel,

and are seeking an award of compensatory and punitive damages.

16

47.     Moreover,  in order to further protect its investment of over $103 million in the A-3 Notes that MBIA fraudulently induced Patriarch XV to purchase, Patriarch XV has filed this involuntary petition in order to restructure Zohar-I for the benefit of all creditors, not just MBIA. *In re Kingston Square Assoc.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) (denying motion to dismiss involuntary petition orchestrated by insider with debtor's creditors in circumvention of charter provision that restricted debtor's ability to file a voluntary petition, where persons in control abdicated their duties and bankruptcy was only way to preserve value for junior interests).

### E.      Patriarch's Proposed Restructuring of Zohar-I

48.     Patriarch XV intends to propose a Chapter 11 Plan of Reorganization For Zohar-I (the "Plan") and a Disclosure Statement Accompanying Chapter 11 Plan of Reorganization (the "Disclosure Statement").  The Plan will be straightforward.  It will contain only two classes of impaired creditors:  (i) a class comprised of the A-1 and A-2 Notes controlled by MBIA, and (ii) a class comprised of the A-3 Notes held by Patriarch XV.  As noted above, there is no dispute that A-1 Notes and A-2 Notes are over-secured.  Accordingly, the Plan will propose to pay MBIA in full.

49.     The restructured A-3 Notes held by Patriarch XV will be fully subordinated to the A-1 and A-2 Notes.  Accordingly, Patriarch XV will receive no payments on the A-3 Notes until the A-1 and A-2 Notes are paid in full.  Reorganized Zohar-I will enter into an amended and restated collateral manager agreement with Patriarch VIII on terms consistent with those of the prepetition management agreement.  However, Patriarch VIII will defer all management fees until the A-1 and A-2 Notes are paid in full.

17

**ARGUMENT**

50.     Except as may be terminated or extended by a court for cause, Bankruptcy Code section 1121 sets the period of time during which a debtor has the exclusive right to file a plan of reorganization and solicit acceptances thereof to 120 and 180 days, respectively. *See* 11 U.S.C. §§ 1121(b), (c).  Although the Bankruptcy Code does not define "cause," bankruptcy courts have great latitude in deciding, on a case-by-case basis, whether to terminate or extend exclusivity. *See*, *e.g.*, *In re Energy Conversion Devices, Inc.*, No. 12-43166, 2012 WL 2779036, at *2 (Bankr. E.D. Mich. June 11, 2012) (quoting *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995) (interpreting the word "may" in Bankruptcy Code section 1121(d), coupled with the lack of definition for "cause," to confer upon the bankruptcy court great latitude in deciding whether to modify a debtor's exclusive period)); *In re Sharon Steel Corp.*, 78 B.R. 762 (Bankr. W.D. Pa. 1987) (same).

51.     Indeed, one of the fundamental purposes of Bankruptcy Code section 1121 is "to limit the delay that makes creditors the hostages of" the chapter 11 process.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (characterizing Bankruptcy Code section 1121 as "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise"), *aff'd*, 484 U.S. 365 (1988); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988) (discussing legislative history to Bankruptcy Code section 1121(d) and noting that "unlimited exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to force unfair concessions") (emphasis omitted). Although courts in this jurisdiction often examine

18

the non-exclusive list of "*Adelphia* factors"[2] in determining if cause exists to terminate exclusivity, they have also recognized that some of the *Adelphia* factors may be more relevant or important than others based on the facts of each case. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014); *In re Borders Grp., Inc.*, 460 B.R. 818, 827 (Bankr. S.D.N.Y. 2011); *see also Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus., Inc.)*, 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (emphasizing that not all of the factors are relevant in each case and that it lies within the discretion of the bankruptcy court to determine which are appropriate in each case); *In re Dow Corning*, 208 B.R. 661, 669 (Bankr. E.D. Mich. 1997) ("[W]hen a court considers a laundry list of factors in the course of deciding a matter, it is not limited to the elementary task of counting the factors. Sometimes one or more factors strongly point to a particular result while others point the other way only weakly. And sometimes certain factors are just more relevant or important than others.").

52.     Moreover, the *Adelphia* court recognized that the case law factors may not be determinative in every case and that the "primary consideration" for a court in determining whether exclusivity should continue or terminate is whether termination "will move the case forward." *See Adelphia*, 352 B.R. at 590 (quoting *Dow Corning*, 208 B.R. at 670). This amounts to "a practical call that can override a mere toting up of the factors." *Id.*; *see also In re Henry May Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) ("[A] transcendent

---

[2]     The *Adelphia* factors include: (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) whether the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time that has elapsed in the case; (8) whether the debtor is using exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586–87 (Bankr. S.D.N.Y. 2006) (citing *Dow Corning*, 208 B.R. at 664 and explaining that while "cause" is not defined in the Bankruptcy Code, courts have developed a list of factors to inform the inquiry, which have come to be called the "*Adelphia* factors").

consideration is whether adjustment of exclusivity will facilitate moving the case forward to a fair and equitable resolution."). In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly, practical considerations or other considerations in the interest of justice, could override, in certain cases, the results after analysis of the nine factors." *Adelphia*, 352 B.R. at 590.

53. In the instant case, termination of exclusivity will move the case forward materially. As an initial matter, Zohar-I itself has no meaningful interests in these proceedings. Indeed, its common shares do not entitle the holders to any material economic value. Rather, the value in Zohar-I inures to the benefit of the holders of the Notes and preference shares.

54. Moreover, there are no officers of Zohar-I. Prior to the petition date, personnel necessary to monitor the assets were supplied by Patriarch VIII. Finally, the two Cayman Islands directors of Zohar-I have no authority to operate its business or control disposition of its assets. Their duties are limited to very ministerial functions designed to maintain Zohar-I's compliance with Cayman Islands corporate law. Given the lack of any authority, they played absolutely <u>no</u> role in the prepetition restructuring discussions. Accordingly, to maintain exclusivity for the benefit of persons with no economic interest or governance authority would result in this case languishing unnecessarily. *In re Zais Investment Grade Limited VII*, 455 B.R. 839 (Cayman directors consented to involuntary petition of CLO because CLO had no interest in a dispute between holders of different tranches of debt on how best to maximize value of assets).

55. Indeed, MBIA, as the "Controlling Party" under the applicable documents, is the only person "in control" of Zohar-I at this time. Neither the directors nor Patriarch XV have any authority to direct or control the disposition of Zohar-I's assets. Despite MBIA's control

position, the three-year history of MBIA's conduct recounted above demonstrates that Zohar-I's restructuring will not move forward if MBIA is left in charge. The only way this restructuring will move forward is through the tools afforded by the Bankruptcy Code, including by termination of exclusivity so that Patriarch XV can propose the Plan. Significantly, neither MBIA nor Zohar-I will be prejudiced by termination of exclusivity, as both would be allowed to propose their own plans if they choose to do so. *See In re Grossinger's Assocs.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (holding that a loss of plan exclusivity does not mean that the debtor is foreclosed from promulgating a meaningful plan, only that the right to propose a plan will not be exclusive with the debtor).

56. Conversely, a failure to terminate exclusivity will result not only in these cases languishing unnecessarily – Patriarch's restructuring efforts have been stymied by MBIA for three years already – but maintaining exclusivity will also harm Patriarch XV. MBIA has publicly acknowledged that it is over-secured and hence, will be paid in full. As the "Controlling Party" with the exclusive right to control dispositions of Zohar-I's assets, and as the creditor with first claim on the value of Zohar-I's assets by virtue of the priority afforded the A-1 and A-2 Notes, MBIA has no economic incentive to generate value for Patriarch XV, the holder of the A-3 Notes. And Zohar-I, through its directors, have no authority to protect such value. Accordingly, such value can only be protected by Patriarch.

57. Indeed, it is clear from the facts recounted above that MBIA has its sights not only on Zohar-I, but also on Zohar-II. Zohar-II presents $808 million of exposure to MBIA, over five times its exposure to Zohar-I. Zohar-I and Zohar-II hold debt positions in certain of the same companies. During a public earnings call hosted by MBIA executives on November 5, 2015, Mr. C. Edward Chaplin, President, CAO and CFO of MBIA, said that if Zohar-I defaults

on the Notes, "we [MBIA] stand ready to fund the payment at maturity and then to vigorously exercise our rights to ensure recovery of that payment and mitigate the risk of loss on the $808 million of bonds issued by Zohar 2 which mature in January 2017."

58.     MBIA's scheme is to take Zohar-I's assets in a fire sale solely to cover its own position, after which it will use its position as owner of the debt in the operating companies to compel restructurings on terms that afford MBIA an unfair advantage over those companies and their stakeholders and the other stakeholders of Zohar-II.  MBIA has pursued this long-term, bad faith scheme to usurp Zohar-I and Zohar-II through the ruse of fraudulent promises to extend Zohar-I's maturity if issues relating to the B Notes were resolved.  The only way for this abuse to be checked is for exclusivity to be terminated so that Patriarch XV can pursue a constructive restructuring proposal under the auspices of this Court.  Indeed, Patriarch XV also intends to utilize the tools afforded by Rule 2004 to further investigate MBIA in connection with a possible motion to designate any vote of MBIA on any plan – whether proposed by Patriarch or MBIA – as having been cast in bad faith.  *See DISH Network Corp. v. DBSD N. Am., Inc. ( In re DBSD N. Am., Inc.)*, 634 F.3d 79, 104 (2d Cir. 2011).

59.     In addition to the foregoing, the *Adelphia* factors further warrant termination of exclusivity.  The capital structure of Zohar-I is not especially complex.  As noted above, there are only three issues of Notes to be restructured, and only two players at the table, both of whom are sophisticated and very well informed about Zohar-I's assets and prospects.  Moreover, MBIA has had more than sufficient time to negotiate a restructuring.  Patriarch has tried to work with MBIA for *three years*.  MBIA's stunning about-face on its agreement to extend Zohar-I's maturity represents a manifest lack of good faith.  It has used, and undoubtedly will continue to

use, its position as the "Controlling Party" in order to exert undue pressure on Patriarch XV to submit to its demands absent the assistance of this Court.

60.    Exclusivity should be terminated.

### NOTICE

61.    Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Debtors; (c) counsel to MBIA; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; and (f) any such other party entitled to notice pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).   Patriarch XV respectfully submits that no other notice is necessary or required.

### NO PRIOR REQUEST

62.    No prior request for the relief requested herein has been made to this or any other Court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## **CONCLUSION**

For the foregoing reasons, Patriarch XV respectfully requests that the Court (i) enter an order terminating the Debtors' Exclusive Periods and (ii) grant Patriarch XV such other relief as the Court deems just, proper and equitable.

Dated:  New York, New York
         November 22, 2015

SKADDEN, ARPS, SLATE, MEAGHER  & FLOM LLP

By:    */s/ Jay M. Goffman*_____
        Jay M. Goffman
        Mark A. McDermott
        Shana A. Elberg
        Christine A. Okike
        Four Times Square
        New York, New York 10036
        (212) 735-3000

*Counsel to Petitioning Creditor, Patriarch Partners XV, LLC*

## EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| ZOHAR CDO 2003-1, LIMITED, et al., | : | Case No. 15-23680 (RDD) |
| | : | |
| Debtors.[1] | : | |
| | : | |
| | : | |

**ORDER GRANTING THE MOTION OF PATRIARCH PARTNERS XV, LLC**
**TO TERMINATE THE DEBTORS' EXCLUSIVITY PERIODS**

Upon the motion (the "Motion") of Patriarch Partners XV, LLC for an order,
pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"),
terminating the exclusive plan filing and solicitation periods (the "Exclusive Periods") of Zohar
CDO 2003-1, Limited, Zohar CDO 2003-1, Corp., and Zohar CDO 2003-1, LLC (collectively,
"Debtors"); this Court finds and concludes that the Court has jurisdiction over the subject matter
of the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this is a
core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual bases set forth in the
Motion and on the record at the hearing establish just cause for the relief granted herein; the
relief requested in the Motion is in the best interests of the Debtors, their estates and their
creditors; notice of the Motion was sufficient, and no other or further notice need be provided;
and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED**
that:

---

[1] The Debtors and, where applicable, the last four digits of their taxpayer identification numbers are as follows:
Zohar CDO 2003-1, Limited (5119), Zohar CDO 2003-1, Corp., and Zohar CDO 2003-1, LLC. The address for
Zohar CDO 2003-1, Limited is c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South
Church Street, George Town, Grand Cayman, Cayman Islands and the address for all other Debtors is c/o
Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711.

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to Bankruptcy Code section 1121(d), the Debtors' Exclusive Periods are hereby terminated. Any party in interest may file and solicit a plan of reorganization for the Debtors.

3.      The terms and conditions of this order shall be immediately effective and enforceable upon its entry.

4.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2015
New York, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE