# **EXHIBIT A**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4053 / March 30, 2015

INVESTMENT COMPANY ACT OF 1940
Release No. 31539 / March 30, 2015

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3644 / March 30, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16462

| | |
|---|---|
| In the Matter of<br><br>   LYNN TILTON;<br><br>   PATRIARCH PARTNERS, LLC;<br><br>   PATRIARCH PARTNERS VIII, LLC;<br><br>   PATRIARCH PARTNERS XIV, LLC; AND<br><br>   PATRIARCH PARTNERS XV, LLC,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, AND NOTICE OF HEARING |

**I.**

    The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Lynn Tilton ("Tilton"); Patriarch Partners, LLC ("Patriarch"); Patriarch Partners VIII, LLC ("Patriarch VIII"); Patriarch Partners XIV, LLC ("Patriarch XIV"); and Patriarch Partners XV, LLC ("Patriarch XV") (collectively, "Respondents").

## II.

After an investigation, the Division of Enforcement alleges that:

**A.      SUMMARY**

1. Since 2003, Respondents have defrauded three Collateralized Loan Obligation ("CLO") funds they manage and these funds' investors by providing false and misleading information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets. Lynn Tilton, who controls and makes relevant decisions on behalf of each of the Respondents, is responsible for all of these violations.

2. The three CLO funds, collectively known as the "Zohar Funds," raised more than $2.5 billion from investors and used these investments to make loans to distressed companies. These loans to distressed companies are the primary assets of the Zohar Funds. However, many of the distressed companies have performed poorly and have not made interest payments, or have made only partial payments, to the Funds over several years.

3. As required under the relevant deal documents, through the trustee, Tilton's entities regularly provide information to the Funds and their investors about the performance of the Funds. This information includes valuation categorizations of the Funds' assets and financial statements purportedly reflecting the financial position of each Fund.

4. Despite the poor performance of many of the Funds' assets, Tilton has intentionally and consistently directed that nearly all valuations of these assets be reported as unchanged from their valuations at the time the assets were originated.

5. These actions are inconsistent with the categorization methodology set forth in documents governing the Funds. This methodology turns on, among other factors, whether a distressed company has timely made interest payments to the Funds. Instead of applying this methodology, Tilton instead substitutes her own, independent discretion when categorizing the Funds' investments. At Tilton's direction, Respondents will not assign a lower valuation category to an asset unless and until Tilton subjectively decides to stop "supporting" the distressed company.

6. If Respondents had applied the categorization methodology set forth in the documents, certain valuation ratio tests derived from the categorizations would have failed by at least 2009. As a result, based on other provisions in the documents, management fees and other payments to Tilton and her entities would have been reduced by almost $200 million, and investors would have gained more control over the Funds' activities, among other consequences. By applying her own discretion rather than the valuation methodology set forth in the governing documents, Tilton has avoided these consequences and taken

2

excessive fees from the Funds. As a result, Respondents' practices were inconsistent with disclosures and created a clear conflict of interest.

7. Respondents also prepare quarterly financial statements for the Funds, which are provided to investors. These financial statements include disclosures about the Funds' loan impairment policy and portfolio fair value. Tilton certifies these financial statements and represents that they are prepared in conformity with generally accepted accounting principles ("GAAP").

8. However, contrary to these statements, Respondents do not prepare the financial statements in conformity with GAAP. Significantly, rather than applying a GAAP-compliant impairment methodology, Respondents impair assets only when Tilton decides to withdraw support for a distressed company. This approach mirrors the discretionary approach Tilton uses to categorize assets and does not conform with GAAP. It is also inconsistent with other disclosures in the financial statements that falsely indicate that Respondents assess and consider impairment issues and the fair value of the Funds' loan assets.

9. Respondents have never disclosed Tilton's discretionary valuation approaches to the Funds or their investors, much less the conflict of interest these approaches created. As a result, Respondents also breached their fiduciary duties and their contractual standard for managing the Zohar Funds as set forth in the relevant deal documents.

B. **RESPONDENTS**

10. **Lynn Tilton**, age 55, is a resident of Rumson, New Jersey and Highland Beach, Florida. Tilton manages each of the Patriarch entities described below. She also controls their decisions.

11. **Patriarch Partners, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch's employees, including Tilton, run the businesses of Patriarch VIII, Patriarch XIV, and Patriarch XV (collectively, the "Patriarch Collateral Managers"). Patriarch is indirectly owned 100% by Tilton.

12. **Patriarch Partners VIII, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch VIII has been registered as a relying investment adviser with the Commission since March 2012 and is the collateral manager for Zohar CDO 2003-1, Limited ("Zohar I"). Patriarch VIII is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

13. **Patriarch Partners XIV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch XIV has been registered as a relying investment adviser with the Commission since March 2012 and is the collateral manager for Zohar II 2005-1, Limited ("Zohar II"). Patriarch XIV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

3

14.     **Patriarch Partners XV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  Patriarch XV has been registered as an investment adviser with the Commission since March 2012 and is the collateral manager for Zohar III, Limited ("Zohar III").  Patriarch XV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

### C.    FACTS

Structure, Strategy, and Performance of the Zohar Funds

15.     Tilton structured the Zohar Funds as CLO funds.  A CLO fund is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes and uses the proceeds to purchase a portfolio of commercial loans.  A collateral manager, typically an investment adviser, determines what loans to purchase or originate on behalf of the CLO fund.  Cash flows and other proceeds from the collateral are used to repay the investor noteholders in the CLO fund.

16.     The Zohar Funds' investors invested in the Zohar CLO Funds in return for the promise of regular interest payments and the repayment of their principal on a specified maturity date.  The three Zohar CLO deals have the following details:

| Name of Deal | Date of Issuance | Approximate Principal Amount of Notes | Maturity Date |
|---|---|---|---|
| Zohar I | 2003 | $532 million | November 2015 |
| Zohar II | 2005 | $1 billion | January 2017 |
| Zohar III | 2007 | $1 billion | April 2019 |

17.     Each Zohar deal is governed by various deal documents, including the indenture and the collateral management agreement ("CMA").  Tilton signed each indenture and each CMA as Manager of the collateral manager.

18.     The indenture describes the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments.  The indenture also describes the rights of the parties and responsibilities of the collateral manager.

19.     The CMA, a contract between the issuer and the respective Patriarch Collateral Manager, engages Patriarch VIII, XIV, or XV as the collateral manager for the deal and describes that entity's obligations and compensation.

20.     The CMA for each deal allows the Patriarch Collateral Manager to select and manage the collateral to be held by the fund. Through the Patriarch Collateral Managers, Tilton used the funds raised from investors to buy or make loans to primarily private, mid-sized distressed companies (the "Portfolio Companies").  Tilton typically directed more than one of the Zohar Funds to extend loans to the same Portfolio Company.

4

Every quarter, the investors receive an interest payment, generated from the collective interest payments made by the Portfolio Companies.

21. In connection with the loans made to distressed companies, the Zohar Funds obtained equity in the Portfolio Companies. Tilton also obtained equity in many of the Portfolio Companies through other entities she owned.

22. Tilton's management strategy for the Zohar Funds is and has been to improve the operations of the distressed Portfolio Companies so that the companies can pay off their debt, increase in value, and eventually be sold for additional profit. However, the Portfolio Companies as a whole have performed worse than expected.

23. As a result, Tilton has now informed the investors in Zohar I that, without an extension on the maturity date, they will suffer significant losses when their notes in the CLO fund mature in November 2015. Because of the tremendous overlap in the investments across the three deals, any default in Zohar I would have significant ramifications for Zohar II and Zohar III as well.

<u>Tilton's Management and Control of the Zohar Funds and the Portfolio Companies</u>

24. Tilton is the chief executive officer ("CEO") and sole principal of Patriarch Partners, LLC, which employs individuals in various roles to support the Zohar Funds.

25. Tilton and entities under her control own all of the Patriarch Collateral Managers. The Patriarch Collateral Managers have no employees of their own, but instead rely on the employees of Patriarch to conduct business. Tilton makes all significant decisions relating to management of the collateral. She also signs all transaction documents on behalf of the Patriarch Collateral Managers.

26. The Patriarch Collateral Managers are entitled to a Senior Collateral Management Fee of 1% of the amount of assets in the deal, paid quarterly, and a Subordinated Collateral Management Fee (the "Subordinated Fee") of 1% of the amount of assets in the deal, also paid or accrued quarterly. As discussed below, payment or accrual of the Subordinated Fee is dependent on the performance of a valuation test.

27. Entities controlled by Tilton hold preference shares in the Zohar Funds. Distributions on those preference shares are also contingent on the outcome of the valuation test.

28. Tilton actively manages the business of the Portfolio Companies. She hires and fires their senior employees and provides input on their major operating decisions. Tilton requires that the companies report regularly to her regarding their financial condition and business prospects. Tilton is the CEO of some of the Portfolio Companies. In other instances, Tilton is the sole manager of the Portfolio Companies that are LLCs.

5

**Tilton Is Improperly Valuing Fund Assets and Improperly Collecting the Subordinated Fee and Other Payments.**

<u>The Purpose, Calculation, and Publication of the OC Ratio Test</u>

29.     The indenture for each of the Zohar CLOs contains certain numeric tests that must be met on a monthly basis.  If those tests are not met, the indenture outlines certain consequences, which include increased rights by the investors to control the fund and/or remove the collateral manager, and elimination of the Funds' obligations to pay the Subordinated Fee.  Failure of these tests also changes the waterfall distribution for each Fund, such that investors receive earlier repayments on their principal.

30.     One of those tests is the Overcollateralization Ratio (the "OC Ratio") test.  The OC Ratio is a numeric formula that, in this case, divides the total value of the loans the relevant Zohar Fund has made to Portfolio Companies by the outstanding principal balance of the notes due to the Fund's investors.

$$\text{OC Ratio} = \frac{\text{Value of Funds' Loan Assets}}{\text{CLO Investors' Principal}}$$

31.     The higher the OC Ratio, the greater the cushion between the value of the Fund's collateral and the principal amount of investors' notes.  As the numerator and denominator in the OC Ratio approach the same level, the chance of an investor suffering losses in its principal grows.

32.     The OC Ratio test is satisfied if the resulting percentage is at least equal to the threshold percentage defined in the indenture.  For the three Zohar Funds, that percentage varies, ranging from 105% to 112%.  If the OC Ratio falls below these levels, then the consequences outlined in the indenture would be triggered.  Patriarch consistently monitors the OC Ratio test percentage.  However, based on Tilton's inputs, the OC Ratio test has never failed, despite the substantial decline in value of the Zohar Funds' assets.

33.     Under the terms of the indentures, the trustee for each of the Zohar Funds is required to prepare and distribute a monthly report to noteholders that contains various information about the fund and its assets, including the outstanding balance of the notes, interest received, a description of the loans in the portfolio, and the outcome of tests relating to the collateral, including the OC Ratio test.

34.     The indenture for each Zohar CLO also requires the collateral manager to categorize each loan that the fund makes or acquires.  The category of each asset, which is published in the trustee reports, determines its value for calculating the numerator of the OC Ratio.  Therefore, a change in categorization of an asset results in a change to the ratio.

35.     In the case of Zohar I and Zohar II, asset categories are numbered 1 through 4.  Category 4 assets are the strongest and are typically valued at the principal amount

6

outstanding on the loan to the Portfolio Company. Category 1 assets are the weakest and are valued at a lower amount.

36.    For Zohar III, the numeric category designations were replaced with just two categories: "Defaulted Investment" and "Collateral Investment." These are equivalent to Categories 1 and 4, respectively.

<u>Tilton's Control Over Improper Asset Categorizations</u>

37.    Each indenture contains a very specific definition for each asset category. Under the Zohar I and II indentures, an asset may be categorized as a Category 4 only if it meets specific criteria, most notably that the asset is "Current." A loan is "Current" when it is not "Non-Current." A "Non-Current" loan is a "Defaulted Obligation" which has "previously deferred and/or capitalized as principal any interest due." A "Defaulted Obligation" is a loan "with respect to which a default as to the payment of principal and/or interest has occurred (without regard to any applicable grace period or any waiver of such default) but only so long as such default has not been cured."

38.    The Zohar III indenture approaches categorization slightly differently, but the result is the same. Under the Zohar III indenture, a loan is a "Defaulted Investment" when "a default as to the payment of principal and/or interest has occurred, but only so long as the default has not been cured."

39.    Based on these contractual definitions, the assets in the Zohar Funds should be reclassified as Category 1 or Defaulted Investments when they are no longer Current, i.e., when the Portfolio Company has failed to make interest payments and has not cured these non-payments.

40.    However, instead of following the definitions set forth in the indentures, Tilton has consistently and intentionally used her own discretion to determine how an asset should be categorized. Respondents do not lower an asset's valuation category unless and until Tilton decides that she will no longer "support" the Portfolio Company. By "support," Tilton means that she will continue to provide financial and managerial support to the Portfolio Company.

41.    Loans originated or acquired by the Zohar Funds were generally initially assigned the highest valuation category -- a Category 4 or Collateral Investment. Over the life of the Funds, Respondents have recategorized a Portfolio Company's loans as a Category 1 or Defaulted Asset only if and when Tilton decided she would no longer "support" the Portfolio Company.

42.    As a result of Tilton's discretionary approach to the categorization of the collateral, she has classified very few Portfolio Companies as a Category 1 or Defaulted Asset at any point. For example, as of January 2014, out of 122 loans in the Zohar II portfolio, only 16 were classified as Category 1. The same pattern exists over the life of all three Zohar Funds.

7

Consequences of Tilton's Improper Categorization

43. Had Tilton followed the methodology for categorization set out in the indenture, the number of Category 1 or Defaulted Investments reported in the monthly trustee reports would have looked very different. In fact, many Portfolio Companies had large sums of unpaid interest, beginning by at least 2008. Certain Portfolio Companies have failed to pay as much as 90% of the interest that they owe to the Zohar Funds, yet remain classified as a Category 4 or a Collateral Investment.

44. Had Respondents appropriately classified the Zohar Funds' assets, Zohar II and Zohar III would have failed the OC Ratio test by at least the summer of 2009. Tilton's approach allowed Respondents to collect or accrue almost $200 million in Subordinated Fees and preference share distributions to which she was not entitled.

45. Moreover, investors were not informed about the decline in value of the Funds' assets, regardless of whether the changes caused the OC Ratio test to fail.

Tilton's Control Over Interest Payments By Portfolio Companies

46. Tilton has been aware of the interest payments made by the Portfolio Companies and their financial condition since the Funds' inceptions. Tilton regularly receives a quarterly interest projection, in which she is notified of the amount of interest on loans a company expects to pay that quarter.

47. Numerous emails show Tilton directing the amount of interest that a Portfolio Company should pay, which may or may not equal the amount that the company wishes to pay. For example, in a 2011 email chain, a Patriarch employee asked Tilton for guidance on interest payments from several different companies. In response, Tilton directed that one company should pay $50,000, one company should pay $142,000, and one should pay $12,800. None of these amounts matched the amount of interest due on the loans to these Portfolio Companies.

48. Tilton makes the ultimate decision on when to accept less than the contractual rate of interest from the Portfolio Companies.

Investors Do Not Know About Tilton's Approach

49. Respondents have not at any time disclosed Tilton's discretionary approach to categorization to the Funds or their investors. They have not disclosed that they fail to consider past due interest when conducting categorization analyses and performing the OC Ratio test. Investors have not been told that the OC Ratio test would have failed at various points if Tilton had performed the categorization analyses in the method anticipated by the indentures.

50. Other parties to the transaction were similarly unaware of Tilton's approach. For example, an email from an employee at the trustee to a Patriarch employee questions why there are "multiple uncollected interest payments for Zohar II and III for assets we

8

have flagged as Performing." Similarly, a rating agency employee emailed in 2010, inquiring why certain Portfolio Companies were not considered defaulted in light of unpaid interest. At the time the investments were structured, the insurer for certain of the Fund investments described its understanding of the meaning of Category 4 as "[c]ompanies will pay current interest and most will have an amortization schedule. . . ." Respondents also have not provided information to any of these parties about Tilton's actual, discretionary categorization approach.

51.    Respondents' approach to categorization, and the resulting impact on the OC Ratio test, were important to investors and rendered statements about asset categories and OC Ratio test results false or misleading. Respondents' discretionary approach to categorization, which was contrary to disclosures made, also represents a fraudulent and deceptive scheme, practice, and course of business.

**Tilton and the Patriarch Entities Breached Their Fiduciary Duties and Failed to Meet Their Contractual Standard of Conduct in Disclosing Their Conflict of Interest**

<u>The Patriarch Collateral Managers Are Fiduciaries and Have Agreed to a Contractual Standard of Conduct</u>

52.    Patriarch, the Patriarch Collateral Managers and Lynn Tilton all acted as investment advisers to the Zohar Funds they managed. As such, they owed fiduciary duties to these Funds.

53.    In addition, the CMA defines a contractual standard of conduct required by the collateral manager. Specifically, the CMA requires that the relevant Patriarch Collateral Manger, "in rendering its services as Collateral Manager use reasonable care and the same degree of skill and attention . . . exercised by institutional investment managers of national standing generally in respect to assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions."

<u>Tilton and Her Entities Have Not Disclosed The Facts Giving Rise To A Conflict Of Interest</u>

54.    Tilton's undisclosed approach to categorization creates a significant conflict of interest. Respondents are making decisions in a way that allows Respondents to collect more money from the Funds and retain absolute control over their management, regardless of the performance of the Funds' assets.

55.    As noted above, Tilton decides when to accept less than the full interest due from Portfolio Companies. Tilton also determines the categories for portfolio assets. As long as Tilton follows her self-designed approach to categorization, which gives her absolute discretion, Respondents can keep classifying assets in the highest valuation categories and prevent triggering the consequences for failure of the OC Ratio test. In light of these consequences, Tilton's conflict of interest is and has at all times been material.

9

56. In breach of their fiduciary duties and contractual standard of conduct, Patriarch, Tilton, and the Patriarch Collateral Managers have not disclosed Tilton's actual method of categorization or the conflict of interest that arose from use of that method. They also have not given the Funds or investors a choice as to whether to consent to this conflict.

**The Zohar Funds' Financial Statements Are Also False and Misleading.**

Preparation of the Financial Statements

57. Each of the Zohar Funds is required under the terms of the indenture to provide GAAP-compliant financial statements on a quarterly basis. These financial statements are prepared by Patriarch's accounting department, approved by Tilton on behalf of the Patriarch Collateral Managers, and then provided to the trustee, which makes them available to investors. Information in the financial statements about the value of the Funds' assets was important to investors.

58. Each financial statement contains a cover page and certification, signed by Tilton. The certification provides, in part, that the balance sheet and income statements provided are prepared in accordance with U.S. GAAP. Tilton also certifies that she has reviewed the balance sheet and income statements and that those documents fairly present the financial position of the relevant Zohar Fund in all material respects.

59. Since the inception of the Zohar Funds, Tilton has signed about fifty of these certifications on behalf of the relevant Patriarch Collateral Manager, each time attesting to the GAAP compliance and fair presentation of the financial statements.

60. However, the financial statements are not GAAP-compliant, nor do they present a fair picture of the Zohar Funds' financial conditions.

Misleading Information Relating to Asset Value and Impairment

61. Loans to Portfolio Companies are recorded on the Zohar Funds' financial statements at cost and make up the vast majority of assets on the balance sheet, with a corresponding payable to investors in the Zohar Funds.

62. Under GAAP, a loan is impaired, and must be measured for impairment when, based on all available information, it is probable that the creditor will be unable to collect all amounts due for interest and principal based on the contract with the debtor.

63. Patriarch did not analyze the Zohar Funds' loan assets for impairment in accordance with GAAP or follow this required impairment methodology.

64. At Tilton's direction, Patriarch does not write down loans for impairment purposes but, instead, writes them off if and when Tilton determines that she will no longer support a Portfolio Company.

10

65.     The impairment decision is driven by Tilton's categorization—when she decides to change the category of an asset from a 4 to a 1, that asset will be impaired in the financial statements.

66.     Even though Patriarch does not conduct an impairment analysis that complies with GAAP, Respondents tell investors that it does.  For example, under the heading "Carrying Value of Collateral Debt Obligations" in the footnotes to the Zohar II financial statements, the financial statements disclose:

> In the event the Company's expected realization of principal under a [loan asset] is impaired, such that the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss equal to the amount of the anticipated shortfall and will thereafter carry the loan at the reduced amount.[1]

67.     However, Patriarch has no procedures in place to analyze future collections and no such analysis occurred.

68.     This disclosure is misleading because it tells investors that assets would be analyzed for impairment, including an assessment of anticipated collections.  Further, all loans that were modified to provide a concession to a Portfolio Company that was under financial duress should have been identified and measured as impaired in the Zohar Funds' financial statements.  Instead, as with categorization, Tilton decided when an asset was impaired using her own discretion and did not communicate this approach to investors.

Misleading Disclosures Regarding Fair Value of Loans

69.     The footnotes to the Zohar Funds' financial statements also were and are misleading in their disclosure of how loan assets are valued.

70.     These footnotes have consistently stated that the fair value of the loans in the portfolio is approximately equal to their carrying value on the balance sheet.  This statement is unsupportable and misleading.

71.     The footnotes have also consistently and misleadingly disclosed that, "[f]or substantially all of the" loans, "fair values are based on estimates using present value of anticipated future collections or other valuation techniques."

72.     In reality, there was never any analysis of present value of anticipated future collections, and no analysis at all was conducted to determine fair value.  Instead, at Tilton's direction, Patriarch at all times carried these assets at cost unless and until Tilton decided to stop supporting the relevant Portfolio Company.

73.     Because Patriarch did not conduct fair value analyses, there was never any basis for the affirmative assertion that cost and fair value were the same.  Moreover, these

---

[1] The financial statements for Zohar I and Zohar III contain similar disclosures.

11

disclosures indicate that Patriarch does conduct an analysis of the reported fair values, which is not true.

### E.    VIOLATIONS

74. As a result of the conduct described above, Respondents willfully violated Sections 206(1), 206(2), and 206(4) of the Advisers Act, which prohibit fraudulent conduct by an investment adviser.

75. As a result of the conduct described above, Respondents willfully violated Advisers Act Rule 206(4)-8, which prohibits fraudulent conduct by advisers to "pooled investment vehicles" with respect to investors or prospective investors in those pools.

76. As a result of the conduct described above, Patriarch alternatively willfully aided and abetted and caused violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder, by Tilton and the Patriarch Collateral Managers.

### III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A. Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B. What, if any, remedial action is appropriate in the public interest against Respondents pursuant to Sections 203(e) and 203(f) of the Advisers Act including, but not limited to, disgorgement and civil penalties pursuant to Section 203 of the Advisers Act;

C. What, if any, remedial action is appropriate and in the public interest against Respondents pursuant to Section 9(b) of the Investment Company Act including, but not limited to, disgorgement and civil penalties pursuant to Section 9 of the Investment Company Act; and

D. Whether, pursuant to Section 203(k) of the Advisers Act Respondents should be ordered to cease and desist from committing or causing violations of and any future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder, whether Respondents should be ordered to pay a civil penalty pursuant to Section 203(i) of the Advisers Act and Section 9(d) of the Investment Company Act, and whether Respondents should be ordered to pay disgorgement pursuant to Section 203(j) and 203(k)(5) of the Advisers Act and Section 9(e) of the Investment Company Act.

## IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R.  §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondents as provided for in the Commission's Rules of Practice.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice.  Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Brent J. Fields
Secretary